Opinion delivered March 14, 1888.

-----

No. 2504.

## Ben McCline v. The State.

Practice—Diligence—Continuance—New Trial.—A rule of practice which obtains in this State is that if an application for a continuance be refused, and the evidence adduced on the trial discloses that the evidence set out in the application for continuance was material and probably true, a new trial should be granted. See the opinion for a showing of diligence *held* insufficient to have authorized the award of a con-

tinance, but see the same and the statement of the case for evidence disclosed in the application for continuance, which, in the light of the evidence on the trial, entitled the accused to a new trial.

APPEAL from the District Court of Navarro. Tried below before the Hon. S. R. Frost.

The death penalty was assessed against the appellant in this case upon his conviction in the first degree of the murder of Alex Benjamin, in Navarro county, Texas, on the seventh day of October, 1887.

Henry Johnson was the first witness for the State. He testified that the killing of Benjamin occured at a festival given at the house of Grandison Barnett, at night, either in September or October, 1887. Among the large number of colored people besides the defendant and the deceased who were in attendance upon that festival were William Sneed, Isam Shaw and Will Johnson. While the last named three were outside of the house, talking, the defendant approached them and said : "You can say what you please, Will Johnson." Deceased stepped up and said : "Anybody who tries to run over Cousin William Sneed will have me to run over." Defendant turned and asked deceased : "What have you got to do with it, you d—d black son of a bitch!" Deceased replied to defendant : "You are none too hot for me." Defendant turned on deceased at once and fired four shots at him, following each shot with the exclamation : "I am none too hot for you, am I !" When he had fired the last of the four shots he turned to the crowd and asked : "Where is the next son of a bitch that wants to die?" He then backed out of the crowd to his horse, mounted, and rode off. About ten minutes later he came back to a tree near the point where the body of deceased was lying, called Sarah Zollicoffer to him, talked with her a few minutes, and then walked off with her. Witness and Grandison Barnett followed and arrested defendant about four hundred yards from the house, brought him back and sent for an officer to whom they delivered the defendant. One of the balls struck the deceased in the face, one in the right breast, one in the groin and the other in the left leg. He lived about an hour or an hour and a half after he was shot. Will Sneed, Will Johnson and Isam Shaw were standing near the house disputing, at the time of the quarrel between defendant and deceased.

On his cross examination the witness said that the killing occurred on the night of the seventh of either September or October, 1887. That was either Tuesday or Wednesday night. Barnett's house was situated about forty yards from a store house which was being built. The festival was given to raise funds for the purpose of buying lumber with which to complete the store. Witness was standing outside when the row commenced. He had just treated Mollie Allen and left the house with her. Hearing the dispute he stopped, and Mollie Allen went on. Witness then folded his arms and watched the progress of events. He observed in the vicinity of the shooting, when it occurred, Mollie Allen, Will Johnson, Will Sneed, Burris and Will Dawson, and Harriet Holmes. Others were about but witness could not recall their names. When defendant reached the festival he hitched his horse to witness's wagon, about five steps from the house. He then stepped up to the parties near the house who were disputing, and said: "Will Johnson, say what you please; I am here to protect you." The conversation then progressed between the parties as stated by the witness on his direct examination, and culminated in the shooting. The shooting occurred at about half past nine o'clock at night. Witness had never seen deceased prior to that night, and had no particular acquaintance with defendant. Defendant said that he lived with Bill Jones.

When the defendant and Sarah Zollicoffer went off together after the shooting, they went towards Sarah's house. Defendant was arrested near Sarah's house, was brought back to the store, Sarah following, and was kept up stairs until morning, when he was turned over to the officer. Defendant and deceased were four or five feet apart when the row between them began. Witness was looking at both of them when the pistol shots were fired. Deceased then had hold of Harriet Holmes's hand, or perhaps it was Harriet who held his hand. Harriet was talking to deceased, but the witness could not understand anything she said. If deceased had anything in his hand during the quarrel or when he was shot, the witness did not see it—and witness saw his hands. Defendant stepped forward and backward between each shot that he fired. Witness's wife was the first person to reach deceased after he fell. It was witness's recollection that Burris Dawson and Sampson Clitus searched the person of deceased after he fell. Harriet Holmes and deceased were standing close together, and one had hold of the other when the

shooting occurred.   Deceased fell at the second shot.   He and defendant were then standing, each, about eight feet distant from the witness.   The moon was shining at the time of the shooting.   The witness at that time was standing well in the shade of the tree.   The crowd was standing about in couples, arranged for playing.   Harriet Holmes did not appear to be making any particular effort to prevent deceased from doing anything.   Anderson Crozier, who was standing in the door when the first shot was fired, ran around the house and approached witness from behind, and called to him, as witness walked towards defendant, to come away, or that deceased would shoot him, witness.   In connection with this witness's testimony, the following diagram was introduced in evidence:

O Witness

Will Johnson was the next witness for the State. He testified that he was in attendance upon the festival given at Grandison Barnett's house on the night of October 7, 1887, and while he and Will Sneed and Isam Shaw were standing at the corner of the house, jowering or disputing, the defendant stepped up and said to witness: "Talk as you please, Will Johnson; nobody shall run over you." Deceased remarked: "If anybody runs over cousin Will Sneed they will have to run over me." Defendant turned to deceased and asked: "What have you got to do with it, you d—d black son of a bitch?" Deceased replied: "You are none too hot." Defendant at once opened fire on deceased, who fell at the second shot. Witness then appealed to defendant not to shoot again, but he fired two more shots, asked "Who wants to die next?" and then got on his horse and left. He soon returned to a point near the scene of the shooting, called Sarah Zollicoffer to him, with whom, after some talk, he walked off. Harriett Holmes was standing by the deceased when he was shot. Witness formed the acquaintance of both the defendant and the deceased during the year 1887. The former lived with Bill Jones. Witness did not know where the deceased lived.

Cross examined, the witness said that he went alone to the festival. He did not know when the deceased reached Barnett's house. Witness, Sneed and Shaw sprang suddenly to one side when the first shot was fired. Deceased did nothing of a hostile nature toward the defendant at the time of, nor just before the first shot was fired. Witness could not say whether or not defendant and deceased were acquainted with each other at the time of the killing. The shooting took place back of and near the corner of Barnett's house. One of the crowds playing at the time were but few feet distant from the defendant and deceased when the shooting took place. Witness did not know whether or not defendant and Will Sneed were acquainted with each other. He did not know whether deceased and Harriett Holmes had hold of each other when the first shot was fired, but they were standing very close together. Witness did not see Henry Johnson during the shooting. He first saw said Henry Johnson after the shooting, just after defendant got on his horse. He saw Henry looking on at the players a short while before the shooting. He did not see Mary Zollicoffer outside the house before the shooting. Henry Johnson's wife was the first person to reach deceased after he fell. Deceased was not dead when defendant came back after running off on his

horse.   An elm tree stood a short distance north of where the shooting took place.

Defendant was arrested and brought back a very short time after he walked off with Sarah Zollicoffer.   The several parties, at the time of the shooting, were standing in or very near the shade of the house. Mary Zollicoffer lived with Bolin Zollicoffer, the husband of Sarah Zollicoffer.   Witness saw deceased when he fell, but saw no one go up and search his body.   He was near deceased from the time he fell until he was taken into the house. Witness then went with Anderson Crozier after Bill Jones.  Witness declared that he and Anderson Crozier did not discuss the shooting en route to Bill Jones's house, and, in reply to a direct question, denied that, en route to said Jones's on that night, he told Crozier that he either saw a pistol in the hands of the deceased, or that he saw deceased attempt to draw a pistol.   He denied that he saw a pistol in the hands of the deceased, and denied that defendant sent for him after the killing.   Henry Johnson was starting off to arrest defendant when witness first saw him after the shooting.   When the defendant first accosted witness while he and others were disputing, and told him to talk as he pleased, witness told him that there was nothing the matter.

Burris Dawson testified, for the State, that he was within three feet of deceased when the first shot was fired.   He was talking to his girl and deceased was talking to Harriet Holmes. Witness could not tell exactly what it was that led up to the shooting.   A dispute of some kind arose between several parties. Defendant spoke in behalf of Will Johnson, and some others in behalf of William Sneed.   Then the defendant passed the witness and fired on the deceased.   He fired a second shot and the deceased fell, exclaiming "O! Lordy! Have mercy!"   Defendant then capered around and fired again, and after more capering and jumping about fired the fourth shot.   After that he "pranced around," asking: "Where is the next son of a bitch who wants to die?"   He then went off, but soon came back and got his girl and went off with her.   Witness next saw him when, a short while later, he was brought back under arrest. Most of the crowd who were ouside, playing, fled into the house when the first shot was fired.   Witness saw Henry Johnson, Will Johnson and Fields Johnson out there just after the shooting.   Henry Johnson's wife, evidently under the impression that the man shot was her relative, Anderson Crozier, was the first

to reach the deceased after he fell. Deceased at the time of his death was living with John Hunt. Witness lived about two miles from John Hunt's, but at that time was working at White Rock. He reached the festival early, and before either the defendant or the deceased arrived. Deceased said, after he was shot, that he and defendant were not acquainted with each other. The shooting occurred, witness thought, at about ten o'clock at night. The witness was talking to Jessie Garrett, and was about three feet distant from the deceased, with his right side towards the deceased, when the first shot was fired. Defendant rushed past witness and, when he reached a point immediately in front of deceased, witness heard the first shot and thought it was a fire cracker. When the second shot was fired, witness saw the pistol in defendant's hand. Witness paid no attention to the several parties until the first shot was fired, as, up to that time, he was talking to his girl, as deceased was to his. Witness had no idea that anybody was going to shoot until the first shot was fired. When that shot was fired, deceased was standing between witness and defendant. When Henry Johnson's wife ran to deceased, he having fallen, defendant had discharged all the chambers of his pistol that would fire, and was still snapping the weapon. Witness reached deceased next after Mrs. Johnson reached him, and was with him until his death. If anybody searched deceased's person during that time, witness did not know it. Henry Johnson and Lewis Barnett went after defendant, arrested and brought him back to the scene of the shooting. Mr. Jones came to the scene of the shooting during the night, but did not go up stairs in the store house to see the defendant until next morning. Henry Johnson was outside of the house during the whole time of the shooting. After he was shot, the deceased asked witness who it was that shot him. Witness told him that it was Ben McCline. Deceased then asked witness to ask McCline why he shot him. Witness went up stairs after defendant was taken up there in arrest.

Will Dawson testified, for the State, that he heard the first two, and saw the last two, of the shots fired by defendant when he killed deceased. Witness jumped from the wagon on which he was sitting with Anderson Crozier when the first shot was fired, and ran towards the crowd. Deceased was lying on the ground when witness saw him after the first shot, and defendant was still shooting at him. Thirty minutes later witness

started to Mr. Hunt's after deceased's mother. When he got back deceased was dead. Meanwhile, defendant had been arrested by Henry Johnson and Lewis Barnett. The witness was between twenty and thirty feet distant from defendant and deceased when the first shot was fired, the deceased being nearest witness, with his left side towards witness. Witness did not know who was the first person to reach deceased after he fell, but Henry Johnson was with him when witness reached him, and must have been near when the shooting occurred. Henry Johnson and Lewis Barnett had each a small pistol when they arrested the defendant. Witness could not say how long it was after the shooting that he saw the pistols in the possession of Henry Johnson and Lewis Barnett. It was perhaps thirty minutes after the shooting when they started to arrest the defendant, and they had the pistols then. If Lewis had a gun, witness did not see it, though he heard somebody say something about, or ask for, a gun.

Henry Johnson, recalled by the State, testified that he had a pistol when he arrested defendant, and that Lewis Barnett also had one. Witness got the pistol he had from Grandison Barnett. They sent Tom Graham after a gun, but did not have the gun when they went to arrest defendant. When witness and Lewis Barnett overtook defendant, witness ordered him to "hold up." He replied: "Don't have to." Witness repeated his order to "hold up," when defendant turned around, pistol in hand, and said: "I don't know whether I will or not." Witness and Lewis then covered him with their pistols and arrested him. They then took his pistol from him, and found it uncocked and one chamber loaded. Soon after the shooting, Grandison Barnett, speaking more directly to the witness than to anybody else, said: "Men, don't let that man get away; arrest him." Witness replied that he had no weapon, and Grandison handed him a six shooter, which he took from a shelf. The witness did not know who owned that pistol. Lewis got his pistol at Grandison's house. When witness returned with defendant he either returned the pistol to Grandison or gave it to some one else. It was witness's understanding that Jake Thomas and Sampson Clitus searched the person of deceased after he was shot. Deceased's clothes were not changed on the night of and after the shooting.

Fields Johnson testified, for the State, that he was in the house when the shooting commenced, and got outside just as

defendant fired the fourth and last shot. About that time witness's mother ran up to the prostrate man and exclaimed that it was Anderson Crozier. Then defendant asked, in a loud voice: "Is that Anderson Crozier?" Some one replied: "No; here is Anderson." Will Johnson then started towards deceased, when defendant, motioning with his pistol, said: "Hold up, God d——n you!" He then turned, flourished his pistol and asked: "Where is the next son of a bitch who wants to be killed?" Deceased and defendant were about two steps apart when the last shot was fired. Defendant soon afterwards got on his horse and left, and within a short time Henry Johnson and Lewis Barnett followed to arrest him. Henry and Lewis had small pistols. Henry's pistol was not a six shooter. After the third shot was fired, the witness saw Henry Johnson standing within two steps of defendant. Jake Thomas and Sampson Clitus sat up with deceased. Doctor Wyrich reached deceased before he died, and deputy sheriff Stephenson came. Witness did not think an inquest was held on the body of deceased.

William Sneed testified, for the State, that just before the shooting he and Isam Shaw and William Johnson were standing at the corner of Grandison Barnett's house, talking and disputing. They were not mad; though, from what subsequently occurred, he supposed that defendant thought they were quarreling. He (defendant) stepped up to the crowd and asked: "What is the matter?" No one answered, and he said to Johnson: "Say what you please, Will; nobody can run over you here." Deceased said: "Nobody can run over Will Sneed." Defendant turned to deceased and asked: "What have you got to do with it, you d——d black son of a bitch?" Deceased replied: "You are none too hot for me!" Defendant at once fired on deceased. At the second shot, deceased threw his hands to his face and fell, and defendant fired on him twice after he fell, and then asked: "Who is the next son of a bitch that wants to die?" Witness did not see defendant pull his pistol, as his back was then towards him. Nobody was directly between witness and deceased when the latter fell, but there were several parties standing around. Some one of the women hallooed that Anderson was shot. Defendant then trotted to his horse, mounted and left, but soon after returned, got off his horse, and then again went off. Witness and deceased were cousins, but neither of them was related to Henry Johnson. Burris Dawson was standing near when the shooting occurred.

Mollie Allen testified, for the State, that she was within three steps of the defendant when he began shooting, and she fled at the first shot. Mary Armstrong spoke to defendant when he began to draw his pistol. She laid her hand on his shoulder and said to him: "Don't do that, Ben; don't do that, Ben." Witness did not observe the deceased until after he was shot. Some boys, Isam Shaw and Will Johnson, were disputing and swearing just before the shooting. Witness saw two and heard another shot as she fled. Lewis Barnett had a pistol in his hand when he and Henry Johnson brought defendant back under arrest.

Lewis Barnett testified, for the State, that he was in the house when the shooting occurred. Deceased was down when he got outside, and Henry Johnson's wife had his head in her lap, looking in his face. Defendant then had his pistol raised, and Henry Johnson was between him and deceased. Defendant soon mounted his horse and rode off as fast as his horse could travel. Henry Johnson proposed to follow and arrest defendant, if witness would go with him. Grandison Barnett said defendant ought to be arrested, and witness went to the house and got his pistol. When Henry Johnson and witness overtook defendant, Henry ordered him to halt. He answered that he did not have to. He was then told he would have to go back. He agreed to go, on promise that he would not be hurt. He had his pistol in his hand, but made no effort to use it. Witness had no gun when the arrest was made. He sent for one but did not get it. He may have had a gun during the time he guarded defendant after the arrest. He did not observe Henry's pistol, and did not know what kind of a weapon it was. Witness went out of the house after the shooting as he was informed that a man had been shot. Ida Garrett was standing near the deceased when the witness reached him. Mary Armstrong was at the festival, but witness had no recollection of seeing her when he went out of the house just after the shooting. Sarah Zallicoffer went off with defendant when he left the scene of the shooting the last time. Anderson Crozier went after Bill Jones. Jake Thompson and Sampson Clitus sat up with deceased's body through the night. The witness saw the doctor examine deceased's wounds, and knew that no weapon was then found on his body. Somebody said that there was a pocket knife in deceased's pocket, but witness did not see it.

Grandison Barnett testified, for the State, that he was in the

house and did not see the shooting. Somebody reported that defendant had killed William Speed. Witness then remarked that defendant ought to be arrested, and he furnished Henry Johnson a pistol to accomplish the purpose. Lewis Barnett also got one of witness's pistols. The State closed.

The testimony for the the defense is clearly indicated in the opinion of the court.

The motion for new trial was supported by the affidavits of Ella Zollicoffer, Anderson Crozier and Mary Armstrong, to the effect that they were standing near the defendant and the deceased at the time of the shooting; that their attention was first attracted directly to the parties by the exclamation of the deceased: "Let me to him (meaning defendant); I will do the dirty work!" and that, advancing upon defendant, deceased thrust his hand in his hip pocket; that defendant retreated, followed by deceased, who said that defendant was "none too hot" for him, when defendant fired. It was likewise supported by the affidavit of W. R. B. Jones, to the effect that Anderson Crozier and Will Johnson came after him on the night of and after the shooting, and that on the way to Barnett's house, the said Johnson told him that he, Johnson, was standing near defendant and called to him: "Look out; Benjamin is about to shoot you!" and that defendant at once fired. Anderson Crozier's affidavit corroborates the affidavit of Jones.

*Reed, Greer & Greer,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

White, Presiding Judge. This is an appeal from a judgment assessing the death penalty in the lower court. There is but a single question in the voluminous record calling for a revision by us, and that is as to the action of the court in overruling defendant's motion for a new trial.

It is shown that the homicide was committed on the night of October 7, 1887; that defendant was arrested immediately, and was conveyed to the county jail the next day, where he has been confined ever since; that the indictment against him was presented and filed on the tenth day of December. By the affidavit of the district attorney, controverting the motion for new trial, it is stated that two of the counsel who represented defendant upon the final trial, represented him on the twelfth day of De-

cember, and set the cause for trial to take place on the eleventh day of January, 1888. On the seventh day of January a copy of the indictment was served upon the defendant, and on the ninth, process by subpœna and attachment was sued out by the counsel representing him on the trial for his witnesses. The process went into the hands of a deputy sheriff on the tenth, who started immediately to execute it, and who makes affidavit that he went about fourteen miles on the way to where the witnesses resided, and on account of snow, sleet and rain he was taken with a chill, and could go no further; "that he believes, if he had not been taken sick and it had not been for high water, he could have served the witnesses, as he certainly could have gotten to where they lived." He returned, with his process not executed, on the twelfth. But on the eleventh the case had been called for trial, and defendant's application for continuance was overruled. On the evening of that day (the eleventh) defendant again sent out another deputy sheriff with attachments for his witnesses, and this officer became water bound in a few miles of where the witnesses lived, and so telegraphed back to the sheriff on the thirteenth. He says that "he believes, had it not been for the high water, he could have gotten the said witnesses to Corsicana by the morning of the fourteenth." After the State had closed its testimony, which, we presume from the date of the filing of the court's charge, was on the thirteenth, defendant moved the court to postpone the trial until he could get his witnesses. This motion the court overruled. Defendant introduced no witnesses except the officers of the court, and they testified only as to the process which had been placed in their hands for him.

Now, the defendant's motion for a new trial set forth, amongst other matters, these facts with regard to the failure to procure the service and attendance of his witnesses, for whose absence he had moved to continue, and again presented his motion to continue for the consideration of the court on his motion for new trial. In support of his motion he also produced the affidavits of three of the several witnesses, who each deposed substantially that they were close to the defendant and deceased when the difficulty occurred; that deceased said, "Let me to him (meaning Ben McCline, defendant); God d—n him; I will do the dirty work," and with that remark put his hand in his hip pocket and advanced on McCline, and that McCline retreated a few steps and fired. They each swear they would have at-

tended the trial as witnesses had they been summoned. Controverting the motion for a new trial in so far as the motion for continuance was concerned, the district attorney showed want of proper diligence on the part of defendant in his statement that, after defendant's attorneys had set the case for trial, near a month had elapsed before process was sued out for these witnesses; that it was only sued out two days before the trial was called, and that after setting the case, he had, by using proper diligence, secured the attendance of the State's witnesses, and they might have done the same as to defendant's witnesses.

The diligence was perhaps insufficient as applied to the application for continuance, when made for a continuance, and the learned judge was correct in overruling the continuance for want of diligence.

Should such insufficiency of diligence have prevailed over the showing made for a new trial? When an application for continuance has been overruled, the statute provides that "if it appears upon the trial that the evidence of the witness or witnesses named in the application was of a material character, and that the facts set forth in said application were probably true, a new trial should be granted." (Code Crim. Proc., art 560, subdiv. 6.) An application for continuance may be defective and invalid for want of some one or more of the statutory requirements, but may be of great weight notwithstanding upon the motion for a new trial; and especially so when the defect was want of diligence only. (Schultz v. The State, 20 Texas Ct. App., 315; see also Strickland v. The State, 13 Texas Ct. App., 364; Beatty v. The State, 16 Texas Ct. App., 421; Jackson v. The State, 23 Texas Ct. App., 183.) On the motion for new trial the principal question, in so far as the continuance is involved, is the materiality and probable truth of the absent testimony.

Now in the case before us there can be no question of materiality of the proposed evidence. Let us see as to its probability of truth. Three absent witnesses have sworn to the same facts in their affidavits, and whilst they are contradicted by the testimony of all the State's witnesses, yet those State witnesses testify that those absent witnesses were present on the occasion of the homicide, and they are located by some of the witnesses in situations with reference to the parties which gave them as good opportunity to see and testify to what did occur as any of the parties who were present. Their testimony would certainly

produce a strong conflict of evidence, to say the least of it, and, upon which side a jury would determine it, it is impossible for us to conjecture. Under the peculiar features of the case, we are of the opinion the learned judge should have granted defendant's motion for new trial; and for error in overruling it the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered March 14, 1888.